STAPLETON, Circuit Judge,
Dissenting:
The critical issue posed by this appeal is one of intent — the intent of the Red Hawk partners when they negotiated their partnership agreement. Given the text of that agreement and the context in which it was executed, I believe the district court clearly erred when it interpreted Section 12(a)(iv) as precluding the three challenged payments to Red Hawk’s limited partners.
The relevant facts are documented and undisputed. Red Hawk is a limited partnership organized under the New Jersey Uniformed Limited Partnership Law to facilitate the investment of its corporate general partner and its individual limited partners in two specific real estate developments. The *505 sole declared purpose of the partnership was to participate in two joint ventures pursuant to identified, previously executed joint venture agreements, each of which would independently develop a parcel of real estate in Bucks County, Pennsylvania. The Timber Knoll joint venture was to develop the Timber Knoll property; the Chestnut Woods joint venture was to develop the Chestnut Woods property. In each instance, management of the joint venture was placed in the hands of an unrelated corporation with experience in the business of real estate development, the Cedar Ridge Development Corporation. The partners of Red Hawk contributed to it capital of $3.5 million. Of this capital, $2.3 million was committed to the Timber Knoll joint venture, and $850,000 was committed to the Chestnut Woods joint venture. It was understood that Cedar Ridge would be simultaneously involved in other real estate development projects in New Jersey, Pennsylvania, and other states.
Under the Chestnut Woods joint venture agreement, Cedar Ridge, as the “Managing Partner,” was authorized to borrow money and to mortgage and sell assets. Red Hawk was to receive a Preferred Minimum Return on Capital prior to any distribution of profits to Cedar Ridge. The preferred return was equal to 15% “per annum based on simple interest payable quarterly on the amount of capital outstanding and not returned.” J.A. at 91. However, “in the event the net cash working reserve of the [joint venture fell] below $500,000, the quarterly preferred return [could] be deferred by the MANAGING PARTNER until the net cash working reserve has sufficient cash in excess of $500,000 to pay the unpaid preferred return.” J.A. at 91-92. The agreement further provided that no partners would have “the right to compel a distribution of profits or cash, unless , the [joint venture] has accumulated an unwarranted amount of cash not reasonably needed for future business activities.” J.A. at 93-94. Red Hawk’s capital contribution was to be returned at the minimum rate of $12,400 per lot sold after the sale of the first 20 lots. In addition, the managing partner committed itself to “make a good faith effort to make minimum annual cash distributions equal to thirty-five percent (35%) of the distributive share of profits allocated to each PARTNER” for tax purposes. J.A. at 94. Distributions could be made in cash or property.
It was in the context of this joint venture agreement and the similar Timber Knoll joint venture agreement that the Red Hawk Partnership Agreement was negotiated. Since the Red Hawk partners understood that cash flow would be coming to Red Hawk from the managing partner of the joint ventures only after Cedar Ridge had established reserves to service the only business operations in which Red Hawk would ever have an interest, the Red Hawk limited partners understandably sought assurance that joint venture profits and return of capital would not be accumulated in the Red Hawk partnership by its general partner, G & A.
The Red Hawk Partnership Agreement thus provided for a mandatory pass-through of cash receipts, whether generated by the joint ventures in the regular course of business or otherwise, after the general partner had paid all of the currently due debt obligations of Red Hawk and had set aside specifically limited reserves. Any reserves were expressly limited to such revenue from operations as the general partner, in its discretion, considered appropriate for the purpose of paying anticipated administrative expenses and, in' the event of the distribution of joint venture property in kind, anticipated property management expenses. Section 12(a) of the agreement thus provided:
(a) Application of Cash Receipts. Cash Receipts shall be applied in the following order of priority:
(i) to the extent required, to the creditors of the Partnership, except to any Partner or any Affiliate thereof;
(ii) to the extend required, to the payment of any debts or liabilities to any Partner or any Affiliate thereof (other than a loan to the Partnership by the Partner);
(iii) to the payment in full of any loans to the Partnership by a Partner;
(iv) to the establishment of such reserves as the General Partner shall reasonably deem necessary; and
*506 (v) to distributions to the Partners in accordance with Paragraphs 12(b) and (c) hereof.
Notwithstanding the foregoing, the General Partner shall not retain and invest any Cash Receipts derived from the operations of the Property, except (1) to defray expenditures for any repair or improvement to any Property, which it, in its sole discretion, deems appropriate or (2) for investments of reserves permitted to be established under clause (ix) of Paragraph 9(b) hereof, nor shall the General Partner invest the net proceeds derived and retained by the Partnership from the sale or other disposition of any Property (including any total condemnation or destruction of any portion of the Property) except as otherwise provided herein.
J.A. at 274.
The term “Property” is defined in the Red Hawk Agreement to mean “the Buildings and Land in Bucks County, Pennsylvania.” J.A. at 261. “Cash Receipts” means “all cash receipts of the Partnership from whatever source derived.” J.A. at 259. Section 9 of that Agreement is entitled “Rights and Duties of the General Partner.” It imposes no duty on the General Partner to set aside reserves for any purpose. In subsection (b)(ix), the subsection referenced in Section 12(a), the general partner is given the authority “to establish reasonable reserve funds from income derived from the Partnership’s operations to provide for future maintenance, repair, replacement, debt service or similar requirements.” J.A. at 265.
Read in the context of the Agreement and the expectations of the Partners, it is apparent that the dominant portion of Sections 12(a) is the paragraph commencing with the clause “Notwithstanding the foregoing.” Indeed, that lead clause requires that this paragraph be given controlling significance over the preceding text. It mandates disbursement to the partners of all cash whether received by Red Hawk in the course of the normal operations of the joint venture properties or whether received by it from dispositions of joint venture property other than in the course of its regular business operations. The two exceptions recognize that the General Partner, in its sole discretion, should have the ability to retain cash derived from operations to establish reasonable reserves for property repairs and improvement, debt service, and other operating expenses.
The subordinate portion of Section 12(a) that precedes the “notwithstanding” clause establishes the priorities among various interests that may compete for distributions of cash receipts. The purpose of subsection 12(a)(iv), in particular, is (1) to recognize the possibility that the General Partner may wish to withhold some funds pursuant to the two express exceptions from the flow through mandate; and (2) to emphasize that the General Partner’s authority to do so is limited to such reserves as it might “reasonably deem necessary.” Thus, subsection 12(a) is designed both to recognize the possibility of retention of cash receipts for authorized reserves at the discretion of the General Partner and, at the same time, to assure the limited partners that there will be no accumulation of even funds for reserves when the general partner, in the exercise of business judgment, could not reasonably regard them as necessary for the designated purposes.
. The Timber Knoll project never got off the ground. The requisite governmental approvals for development were not obtained by the owner of the Timber Knoll site, and the property was never purchased by the joint venture. When it appeared that the objective of the joint venture would have to be abandoned, an amendment to the joint venture agreement was executed that called for the conversion of Red Hawk’s $2.3 million capital contribution into promissory notes of Cedar Ridge. Pursuant to these notes, payments were received by Red Hawk in January 1989, April 1989, and July 1989. These payments represented a return of the capital contribution made by Red Hawk to the Timber Knoll joint venture and interest accrued thereon after the conversion.
The Chestnut Woods project did get underway in late 1988. Cedar Ridge served the Chestnut Woods joint venture not only as managing partner, but. also as “general contractor” for the site improvements. The site improvements were to be financed, at least in *507 part, through bank borrowing. Among these improvements were, of course, storm and sanitary sewer systems. Cedar Ridge, in its capacity as “general contractor,” contracted with plaintiff Henkels & McCoy in December of 1988. Henkels commenced its work at the Chestnut Woods site on January 16, 1989, shortly after Red Hawk received the first payment on the return of its -capital contribution to the Timber Knoll joint venture.
In January, April and July of 1989, Red Hawk’s general partner made the decisions that gave rise to this lawsuit. When each return of capital from the Timber Knoll project was received, G & A decided to deposit a few thousand dollars in Red Hawk’s checking account to cover anticipated administrative expenses and to return the remainder to the limited partners. Henkels seeks to compel return of those distributions to Red Hawk for application to a default judgment it later obtained against Red Hawk.
During the period from January to August 1989, Red Hawk had satisfied its entire capital commitment to the Chestnut Woods joint venture, and it had no significant liabilities of any kind. It was receiving reports from Cedar Ridge that site improvements, after some initial delays, were progressing. Cedar Ridge estimated at the start of this period (i.e., December 1988) that, even without improvements, the entire property could be sold for approximately $78,000 per lot, i.e., $1.8 million. At the end of this period (i.e., August 1989), the Chestnut Woods project was appraised at $2.7 million. It is undisputed that Red Hawk had significant net worth throughout this period.
The district court found it significant that Red Hawk and its partners understood that site improvements were ongoing during the period from January to July 1989 and that the Chestnut Woods joint venture was, accordingly, incurring liabilities. It did not find, however, that this joint venture was insolvent during this period. To the contrary, the record relevant to this period indicates that the liabilities of the Chestnut Woods joint venture did not exceed $1.7 million, that it thus remained solvent, and that trade creditors were being paid on a current basis. In particular, all invoices that were submitted to Cedar Ridge by Henkels during this period were paid in full.
New Jersey’s Uniform Limited Partnership Law provides that a -partner may not receive a distribution from a limited partnership “to the extent that, after giving effect to the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their partnership interests, exceed the fair value of the partnership assets.” N.J. Stat. Ann. § 42:2A-45.. This is the sole mandatory restriction in the law for the benefit of partnership creditors on distributions to partners. Any additional restriction for the benefit of creditors must thus be one voluntarily undertaken by the Red Hawk partners in their partnership agreement.
Our court today holds that the Red Hawk partners, although mandating a pass-through to themselves of cash receipts, intended in Section 12(a) of their partnership agreement voluntarily to impose on themselves a very significant restriction for the benefit of joint venture creditors.’ This voluntary restriction, the court holds by necessary implication, was intended to be sufficiently broad that a distribution could not be made to Red Hawk partners unless cash reserves had been established to fund the payment of all anticipated future liabilities of the joint venture partnerships (owned in part by others) that might accrue over some unspecified period of time, even though those other partnerships were expected to pay their own liabilities with their own or borrowed funds. The record suggests no reason, however, why the partners, when setting up the Red Hawk partnership, would have imposed such an unnecessary and ill-defined burden on themselves, and the text of Section 12(a) does not require such a conclusion that they did.
The court resolves the central issue in this appeal in one sentence: Section 12(a)(iv) “of the Red Hawk partnership agreement specifically provided that cash receipts be used for the establishment of reasonable reserves (for creditors) before such receipts be distributed to the [limited partners].” Opinion at 497. Because Red Hawk’s general partner had reason to believe that Henkels might submit invoices in the future for site improvement work, the court accordingly concludes that *508 the three challenged distributions violated Section 12(a)(iv). .
In my view, the court errs for at least five reasons: (1) In context, Section 12(a)(iv) was intended for the protection of the limited partners, not as a creditor protection device even for creditors of Red Hawk; (2) Section 12(a)(iv), even if viewed as a creditor protection provision, was not intended for the protection of joint venture creditors for whom the joint ventures were to make other provision; (3) the challenged distributions were a return of- capital that the partners had agreed to devote to an abandoned venture, and it is not reasonable to find an intent in Section 12(a)(iv) to commit that capital contribution to the creditors of a different, fully capitalized venture; (4) Section 12(a)(iv) permits the general partner to retain reserves only from “Cash Receipts derived from the operations of the Property” and the challenged distributions did not come from funds generated by operations;[1] and (5) even if Section 12(a) (iv) could reasonably be read to require Red Hawk’s general partner to set aside funds for creditors in Henkels’ position whenever a reasonable general partner exercising business judgment would do so,.this record provides no basis for a conclusion that the failure of Red Hawk’s general partner to set aside funds for Henkels in January through July of 1989 was a decision beyond the bounds of business judgment.
I would reverse and remand with instructions to enter judgment for the defendants.

. The district court correctly found that the three payments representing a return of the capital committed tq the Timber Knoll joint venture did not constitute a "cash receipt from the operations of the Property." It inexplicably concluded from this, however, that the general partner was thus "plainly obligated” to follow the terms of Section 12(a)(iv) and establish a reserve for anticipated future liabilities to Henkels. At the time the Red Hawk partnership agreement was negotiated, the parties were not, of course, anticipating the abandonment of the Timber Knoll venture, and the “notwithstanding” clause does not literally read as applying to a return of capital that does not result from a sale of the joint venture property. Nevertheless, I believe the intent behind the provision governing such sales, and the provisions strictly limiting the objectives of the partnership to participation in specified joint ventures with -specified capitalization, required a pass-through of the payments from the Timber Knoll joint venture. But whether or not this is the case, I find no authority in the agreement for the establishment of reserves other than out of operating revenues.